IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES POWELL,<br><br>　　　　Plaintiff,<br><br>v.<br><br>BOARD OF EDUCATION OF THE CITY OF CHICAGO,<br><br>　　　　Defendant. | Case No. 22 C 1146<br><br>Hon. LaShonda A. Hunt |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles Powell brought this action in state court against his former employer, Defendant Board of Education of the City of Chicago, alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and the Illinois Civil Rights Act of 2002, 740 ILCS 23/5. (Notice of Removal, Ex. 1 at 10-15, Dkt. 1-1).[1] Defendant removed the case asserting federal question jurisdiction and later moved for summary judgment on all of Plaintiff's claims. (Dkt. 56). For the reasons discussed below, Defendant's motion is granted.

## BACKGROUND[2]

### I. Plaintiff's Employment with Defendant

Plaintiff (African American), a retired First Sergeant with the United States Army, was hired by Defendant in November 2004 as a military instructor in the Junior Reserve Officers'

---

[1] Unless otherwise noted, page numbers in citations to the docket reference "PageID #" in the CM/ECF header of the filing, not other page numbers in the header or footer of the document.

[2] The relevant facts are taken from the parties' respective Local Rule 56.1 statements and are undisputed unless otherwise noted. The first 6 facts offered by Plaintiff in his Statement of Additional Material Facts lack any citation to the record and thus the Court did not consider them. L.R. 56.1(d)(2) ("Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation."). The Court further disregarded additional facts

1

Training Corps ("JROTC") department at Phoenix STEM Military Academy ("PSMA"). (Dkt. 68 at ¶¶ 1, 3).[3] Defendant maintains the Chicago Public School ("CPS") system, which includes PSMA. (*Id.* at ¶¶ 2-3). Plaintiff served as a JROTC instructor from the time he was hired in 2004 until his termination in February 2021 and was an at-will, non-union employee. (*Id.* at ¶¶ 3-4). In addition to his role as a JROTC instructor, Plaintiff also served as PSMA's head football coach from April 2005 until his termination. (*Id.* at ¶ 3).

From 2017 to 2021,[4] Plaintiff was one of four JROTC instructors, each of whom were full-time instructors who taught five classes per day, which is considered a "full load." (*Id.* at ¶ 5). The JROTC instructors were supervised by Colonel Michael Chyterbok, the Commandant of PSMA. (*Id.*). In addition to being under Chyterbok's supervision, Plaintiff's direct supervisor was PSMA principal Ferdinand Wipachit (Asian). (*Id.* at ¶ 6; Dkt. 70 at ¶ 10).

II.     **Plaintiff's Disciplinary History at PSMA**

During his tenure at PSMA, Plaintiff had been disciplined by Defendant. According to Wipachit, he issued Plaintiff a verbal warning around 2007-2009 for playing an ineligible student in a football game. (Dkt. 68 at ¶ 11). A decade or so later, in March 2019, Plaintiff received a written reprimand for non-compliance with CPS's finance and purchasing policies. (*Id.* at ¶ 13). Plaintiff was issued this reprimand after he told Wipachit that he signed a contract with a non-CPS vendor bus company to provide services to PSMA without prior approval. (*Id.* at ¶ 12). Even though the contract was cancelled, PSMA was responsible for paying the company the sum of

---

offered by Plaintiff because the citations offered in support of them either failed to actually support the facts or were not included in the materials provided to the Court. (*See* Dkt. 70 at ¶¶ 8, 12-15, 18).

[3] For brevity, the Court refers to Plaintiff's Response to Defendant's Statement of Undisputed Material Facts as "Dkt. 68" and Defendant's Response to Plaintiff's Statement of Additional Material Facts as "Dkt. 70."

[4] As discussed *infra*, Plaintiff's EEOC Charge of Discrimination identifies August 2017 as the time at which the alleged discrimination began. (*See* Dkt. 57-27).

$3,422.07. (*Id.* at ¶ 14). Plaintiff claims the bus company engaged in fraud and points out that there is no evidence PSMA ever paid the bus company. (*Id.* at ¶ 12). Because the written reprimand Plaintiff received stated that this was his "First Misconduct," Plaintiff denies receiving prior discipline from Wipachit. (*Id.* at ¶ 11; see also Dkt. 57-13 at 294).

In June 2019, PSMA administration received a formal complaint against Plaintiff from the parent of a PSMA cadet (a student at the school). (Dkt. 68 at ¶ 15). While the parent alleged that she witnessed Plaintiff engage in an inappropriate interaction with her daughter the day prior to lodging the complaint (*i.e.*, yelling at her in the hallway in a way that belittled her), Plaintiff denies that the interaction was inappropriate and denies he spoke to the student as the parent claimed. (*Id.* at ¶¶ 15-16). One week after receipt of the complaint, Wipachit sent Plaintiff a letter stating that Plaintiff's interaction with the cadet was inappropriate, unacceptable, and displayed poor judgment that reflected negatively on Plaintiff and PSMA. (*Id.* at ¶ 17a).[5] Wipachit warned Plaintiff that such behavior would not be tolerated in the future. (*Id.*). According to Plaintiff, the letter was only a formal warning and he was not given a chance to tell his side of the story at a meeting to discuss the incident (which was attended by Wipachit, PSMA Assistant Principal Margaret Mares, and Chyterbok) because it was already decided that Plaintiff was in the wrong. (*Id.* at ¶¶ 16, 28; *see also* Dkt. 57-7 at 258).

### III. **CPS Volunteer Policy**

At all times relevant to this case, CPS maintained a policy outlining requirements for those wishing to volunteer with CPS (the "Volunteer Policy"). (*Id.* at ¶ 17b). The policy's stated purpose is, in part, to ensure that "prospective volunteers are properly vetted and approved annually" and

---

[5] Defendant included two paragraphs numbered "17" in its Statement of Undisputed Material Facts. (Dkt. 68 at 780-81). To distinguish between the paragraphs, the Court refers to the first paragraph 17 as "17a" and the second as "17b."

3

"that volunteers do not pose undue risk to the health and safety of CPS students." (*Id.* at ¶ 18). Plaintiff was aware of the Volunteer Policy and acknowledged that the policy's goal is to keep students safe while on CPS property and engaged in CPS-related activities. (*Id.* at ¶¶ 23-24).

In accordance with the Volunteer Policy, "[p]rospective volunteers must complete the required CPS volunteer application forms and satisfy the requirements of the applicant review process." (*Id.* at ¶ 20). The policy distinguishes between "Level I" and "Level II" volunteers. (*Id.* at ¶ 21). Level I volunteers are required to submit to a fingerprint background check (while Level II volunteers are not) and include "[a]ny individual serving in a coaching capacity, regardless of the hours/week that the volunteer serves." (*Id.* at ¶¶ 21-22). Plaintiff understood that to serve as a coach (a Level I volunteer), the volunteer was required to undergo a criminal background check. (*Id.* at ¶ 26).

In September 2017, Plaintiff received an email from Kerrie Erwin, the Volunteer Coordinator and a PSMA clerk, reminding him and others that individuals serving in a coaching capacity are Level I volunteers. (*Id.* at ¶ 25). The email included a handout with step-by-step instructions that those wishing to volunteer could follow to complete the application process, along with estimated timelines for each step. (*Id.*). Among others, the email was sent to "Charles Powell <CPowell3@cps.edu>," however Plaintiff insists he has no knowledge as to whether he received this email. (*Id.*; Dkt. 57-23 at 409).

**IV.     Investigation**

In early October 2018, a football player accused PSMA security guard and assistant football coach William Stritzel of slapping him in the face two weeks prior during football practice. (Dkt. 68 at ¶ 27). CPS investigator Latasha Finley was assigned to investigate the allegation. (*Id.*).

It was during this investigation that questions about Plaintiff's compliance with the Volunteer Policy, specifically with respect to Jamell Gooden, arose.

Gooden graduated from PSMA in 2017. (*Id.* at ¶ 34). The parties hotly contest whether Gooden served as an assistant coach, or any sort of volunteer, for that matter, with the PSMA football team following his graduation. (*Id.* at ¶¶ 28-36). During the investigation into the Stritzel allegation, Mares (White), Wipachit, Powell, Gooden, and four football players were interviewed. (*Id.* at ¶¶ 28, 30-31, 34-35; Dkt. 70 at ¶ 11). Finley's investigative report (issued in June 2019) (Dkt. 68 at ¶ 40) reflects the following:

- Mares, three of the four football players, and Plaintiff all stated that Gooden was an assistant football coach. (*Id.* at ¶¶ 28, 30-31);

- Mares stated that Gooden had been volunteering as an assistant football coach since August 2017, and that she recalled telling Plaintiff between September 2017 and September 2018 that Gooden could not volunteer until he passed a criminal background check. (*Id.* at ¶ 29);

- Plaintiff believed that Gooden had taken steps to complete a criminal background check, but as of the date of his interview (November 9, 2018), he knew that Gooden had not yet passed the background check. (*Id.* at ¶¶ 31, 33). For this reason, Plaintiff made sure Gooden stayed by his side during every practice and game and said Gooden could be present as long as there was a chaperone. (*Id.* at ¶ 33);

- Gooden stated he began volunteering as the offensive coordinator for the PSMA football team in August 2017 and that although he recalled completing a criminal background check, he had not received confirmation that he was cleared to volunteer as of his November 14, 2018 interview. (*Id.* at ¶ 34);

- Wipachit said that he was not aware Gooden had been volunteering as an assistant football coach from August 2017 to October 2018, Gooden would not be allowed to volunteer again unless his background check cleared, and he would be sure to enforce the Volunteer Policy moving forward. (*Id.* at ¶ 35).

In addition to the report, the record reflects that Plaintiff prepared the 2018 football roster, which lists Gooden as a varsity football coach, and specifically as the offensive coordinator. (*Id.* at ¶ 32).

Plaintiff denies the accuracy of Finley's report. (*Id.* at ¶¶ 28-31, 33-35, 40). Plaintiff testified that Gooden was not an assistant football coach and spent very little time with the team. (*Id.* at ¶ 30). Mares testified that she did not believe that Gooden was either a coach or a volunteer but rather was simply present in support of his brother, a player on the team. (*Id.* at ¶¶ 28-30, 33-34). According to Plaintiff, Mares told him that Gooden could be present with the football team as long as Plaintiff was always by his side. (*Id.* at ¶¶ 29, 41). Further, Gooden testified that he was not a coach, PSMA never designated him as such, Mares would say that he is not a coach, and that he was called "coach" by the team because it was a sign of respect and easier to say. (*Id.* at ¶¶ 29-30, 32-35, 40). Gooden also described the investigation as "quick" because he was asked only a few questions, even though he made himself available to provide more details. (*Id.* at ¶ 41).

According to Defendant, Gooden did not apply to volunteer with the PSMA football team until November 14, 2018, the same day he was interviewed by investigators. (*Id.* at ¶ 36). Plaintiff disputes this fact, citing testimony of Gooden that he submitted his volunteer application in October 2018 and Jamal Smothers, an assistant football coach, that he helped Gooden fill out a volunteer application in August 2018. (*Id.*). Defendant's records indicate that: Gooden applied to volunteer as a football coach (a Level I volunteer); the PSMA administration referred Gooden's application to CPS's Department of Family and Community Engagement (the entity responsible

6

for reviewing and processing volunteer applications) on November 15, 2018; and Gooden's background check cleared, and his application was approved, on January 19, 2019. (*Id.* at ¶¶ 37-39).

Finley's investigative report found "credible evidence [existed] to support the finding that between August 2017 and October 2018" Plaintiff, Mares, and Wipachit "allowed Jamell Gooden, a June 2017 [PSMA graduate] to participate as an assistant football coach without first passing a criminal background check." (*Id.* at ¶ 40; Dkt. 70 at ¶¶ 10-11; Dkt. 57-17 at 316). Plaintiff testified that he was never made aware of the charges against him, and that investigators failed to interview the PSMA athletic director or assistant coach Smothers. (Dkt. 68 at ¶ 40).

On January 7, 2021, Plaintiff received a letter from Defendant's Office of Employee Engagement informing him that an investigatory conference would be held on January 15, 2021, regarding the allegation that Plaintiff allowed Gooden to serve as an assistant football coach before his criminal background check cleared. (*Id.* at ¶ 41). Plaintiff points out that while he received the letter, it did not inform him that he was allowed to bring witnesses to the conference to testify or issue subpoenas for witnesses. (*Id.*). The investigatory conference occurred on January 15 and was attended by Plaintiff and a hearing officer. (*Id.* at ¶ 42).

On February 2, 2021, Mary Ernesti, the Executive Director of the Office of Employee Engagement, issued a memorandum summarizing the findings of Finley's investigative report and the subsequent investigatory conference. (*Id.* at ¶ 43). Ernesti found that, during the investigation, Plaintiff admitted that Gooden served as a volunteer with the football team, he knew Gooden needed to pass a background check to volunteer with the team, and he allowed Gooden to volunteer even though he had not passed a background check. (*Id.* at ¶ 44). And instead of addressing these allegations, Plaintiff gave "non-credible and unsupported assertions and excuses," citing as an

example the fact that Plaintiff claimed Gooden was called coach because it was "easier to call adults associated with the football team 'coach.'" (*Id.* at ¶ 45). Ernesti found no evidence to show that Gooden submitted a background check prior to November 14, 2018. (*Id.* at ¶ 46). Additionally, Ernesti found that Plaintiff misrepresented his disciplinary history during the investigatory conference, telling the hearing officer that he had always followed CPS policy and had never been accused of misconduct. (*Id.* at ¶ 48). Plaintiff denies that this was a misrepresentation. (*Id.*). Ernesti found that Plaintiff's misconduct was severe, he put the players' safety at risk, and his lack of remorse and failure to acknowledge his wrongdoing rendered remediation impossible, so she recommended that Plaintiff be terminated. (*Id.* at ¶ 52).

While Plaintiff acknowledges the existence of Ernesti's memorandum, he denies that Ernesti correctly analyzed the evidence as a whole or did so in a fair and unbiased manner. (*Id.* at ¶¶ 43-45). For example, Plaintiff claims that the memorandum fails to consider Plaintiff's history with PSMA and balance that against the alleged infraction. (*Id.*). He also points out that Ernesti stated there was no need to assess Plaintiff's credibility regarding whether he committed the misconduct charged. (Dkt. 57-20 at 323). Finally, he reiterates that he testified that Gooden was not a coach and spent little time with the team, which is corroborated by Mares and Gooden's testimony, and that Gooden submitted his background check before November 2018, which is supported by the testimony of Smothers and Gooden. (Dkt. 68 at ¶¶ 44-46).

On February 3, 2021, Plaintiff received a letter from Ernesti stating that she had "determined that sufficient basis exist[ed] to terminate [Plaintiff's employment]." (*Id.* at ¶ 53; Dkt. 57-5 at 254). As of February 4, 2021, Plaintiff was suspended without pay. (Dkt. 68 at ¶ 53). On February 24, 2021, Defendant approved Plaintiff's termination, which became effective February 26, 2021. (*Id.* at ¶ 54). After being terminated, Stritzel (White) replaced Plaintiff as head football

coach. (*Id.* at ¶ 10). Plaintiff contends that while he was never reimbursed for the money he spent while head football coach on storage lockers used to store football equipment, Stritzel did receive such a reimbursement. (*Id.*).

Plaintiff cannot attribute any race-related statements or comments to Wipachit or Mares, nor were any race-related comments or statements made directly to or about him. (*Id.* at ¶¶ 58-59, 62). While Plaintiff contends that Erwin failed to properly and timely process Gooden's volunteer application because she did not like Plaintiff because of his race, an argument he raised for the first time during the January 2021 investigative conference, he admits that he has no documentary evidence to support his claim that Erwin sabotaged or purposefully delayed Gooden's application. (*Id.* at ¶¶ 49, 60; Dkt. 57-20 at 323-24; Dkt. 57-29 at 443-444). Plaintiff did not believe that investigator Finley was personally, racially biased towards him. (Dkt. 68 at ¶ 61). According to Defendant, Plaintiff never complained about racial discrimination prior to the investigation. (*Id.* at ¶¶ 9, 50).

V.      **Administrative Action and Present Lawsuit**

On October 12, 2021, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* at ¶ 55). In it, Plaintiff claimed that during his employment, he was "subjected to different terms and conditions of employment, including but not limited to, being investigated[,]" he believes he was discriminated against because of his race from August 1, 2017 to April 4, 2021, and he was subsequently discharged on April 4, 2021. (*Id.*; *see also* Dkt. 57-27).[6]

---

[6] Defendant notes in its memorandum in support of its motion for summary judgment that it is unclear why Plaintiff indicated he was discharged on April 4, 2021 in his Charge of Discrimination when he was actually terminated in February 2021. (Def.'s Mem. in Supp. of Mot. for Summ. J at 462, n.1, Dkt. 58). The Court shares Defendant's confusion. In his response, Plaintiff only restates that he was terminated in February 2021. (Pl.'s Resp. to Def.'s Mot. for Summ. J. at 493, Dkt. 65).

After receiving a right to sue letter from the EEOC (Notice of Removal, Ex. 1 at 17, Dkt. 1-1), Plaintiff filed suit alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and the Illinois Civil Rights Act of 2002, 740 ILCS 23/5. (Notice of Removal, Ex. 1 at ¶¶ 10-15, Dkt. 1-1). Plaintiff's complaint alleges that he was discriminated against in the following ways: (a) he was not reimbursed for expenses he incurred as the head football coach, while his white counterparts were reimbursed; (b) he was excluded from meetings with other military personnel in which policy was discussed; (c) he was not paid for overtime work while his white counterparts were; and (d) he was required to teach extra instructional sessions while his white counterparts were not. (*Id.* at ¶ 10). It further alleges that he was subjected to a "racially motivated investigation." (*Id.* at ¶ 11). Defendant's motion for summary judgment is fully briefed and ripe for adjudication.

## **LEGAL STANDARD**

A court shall grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *id.* at 324, and support their position with "more than a scintilla of evidence." *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). Summary judgment is the time for a litigant to "put up or shut up" by "show[ing] what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion*

*Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (quotations omitted). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, all "justifiable" inferences are drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *see also Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (non-moving party receives "benefit of conflicting evidence" as well as "any favorable inferences that might be reasonably drawn from the evidence."). Additionally, a court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advocate Health & Hosps., Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted).

## DISCUSSION

Plaintiff contends that Defendant violated federal and state law by discriminating against him because of his race.[7] Under Title VII, an employer is prohibited from discriminating against an individual "with respect to his compensation, terms, conditions, or privileges of employment" because of his race. 42 U.S.C. § 2000e-2(a)(1). In Title VII cases, "an unlawful employment practice is established when the [plaintiff] demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* at § 2000e-2(m). A plaintiff may prove race discrimination using the traditional burden-shifting test articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the more holistic approach recently set out by the Seventh Circuit in *Ortiz v. Werner Enters., Inc.*,

---

[7] The analysis is the same for Plaintiff's Title VII and Illinois Civil Rights Act claims. *Hosick v. Chi. St. Univ. Bd. of Trs.*, 924 F. Supp. 2d 956, 966 (N.D. Ill. 2013)

834 F.3d 760 (7th Cir. 2016). The Court begins by considering the timeliness of Plaintiff's claims and then analyzes Plaintiff's claims under both *McDonnell Douglas* and *Ortiz*.

## I. Timeliness of Claims

Defendant initially argues that many of Plaintiff's claims are barred "due to his failure to timely raise them at the EEOC." (Def.'s Mem. in Supp. at 463, Dkt. 58). Plaintiff's response addresses only his termination in February 2021 and argues that this claim is timely because he filed the charge on October 12, 2021, within 300 days of his termination, and "[t]his claim is fairly encompassed within the subject of his lawsuit." (Pl.'s Resp. at 493, Dkt. 65).

Prior to filing a Title VII lawsuit, a plaintiff "must file an employment discrimination charge with the EEOC within 300 days 'after the alleged unlawful employment practice occurred.'" *Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004) (citing 42 U.S.C. § 2000e-5(e)(1)). "[O]nly those claims that are fairly encompassed within an EEOC charge can be the subject of a resulting lawsuit." *Chambers v. Am. Trans Air, Inc.*, 17 F.3d 998, 1003 (7th Cir. 1994). *See also Graham v. AT&T Mobility, LLC*, 247 F. App'x 26, 29 (7th Cir. 2007) ("A plaintiff generally cannot bring a claim in a lawsuit that was not alleged in the EEOC charge . . . . A plaintiff, however, may proceed on a claim not explicitly mentioned in his EEOC charge 'if the claim is like or reasonably related to the EEOC charges, and the claim in the complaint reasonably could be expected to grow out of an EEOC investigation of the charge.'") (citation omitted).

Despite Plaintiff's charge indicating that the discrimination allegedly began in August 2017, the Court agrees with Defendant that any alleged discriminatory acts which accrued before December 16, 2020—300 days prior to the October 12, 2021, date on which the charge was filed—are time-barred.

**II.      *McDonnell Douglas* Burden-Shifting Method**

Having identified the time period during which actionable claims could have accrued, the Court first considers Plaintiff's claims under *McDonnell Douglas*. The *McDonnell Douglas* test requires a plaintiff to establish a *prima facie* case of discrimination by showing that "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from the employer." *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If the employer can articulate such a reason, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)).

Defendant contends that Plaintiff cannot meet his *prima facie* burden. While there is no dispute that Plaintiff belongs to a protected class and was terminated, Defendant argues that Plaintiff was not meeting legitimate expectations and cannot point to a similarly situated employee outside of his protected class whom Defendant treated more favorably. (Def.'s Mem. in Supp. at 463-467, Dkt. 58). The Court need not resolve whether Plaintiff met Defendant's legitimate expectations or even whether anything beyond his termination constitutes an adverse employment action because Plaintiff has clearly failed to satisfy the similarly situated factor.

Defendant asserts that Plaintiff "has failed to identify a single comparator employee who was treated more favorably than him." (Def.'s Mem. in Supp. at 467, Dkt. 58). In response, Plaintiff cites various employees—Wipatchit, Mares, Stritzel, Chyterbok, coaches Currin and

13

Bernthal, and teacher Waller[8]—whom he maintains violated some CPS policy but received more favorable treatment from Defendant than he did. (Pl.'s Resp. at 486-491, Dkt. 65). But Plaintiff has failed to explain exactly how any of these employees were similarly situated to him and thus would constitute proper comparators.

To be similarly situated, employees do not have to be "identical in every conceivable way," but rather "directly comparable to the plaintiff in all material respects." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quotations and citations omitted). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." (*Id.* at 369) (quotations and citations omitted).

Plaintiff offers nothing specific about any of the individuals he identifies as comparators outside of the general allegation that they each violated some CPS policy. He fails to cite any legal authority to support his position that a mere policy violation alone is sufficient to render employees similarly situated.[9] While there is no hard and fast test used to determine whether employees are similarly situated, *McDaniel*, 940 F.3d at 369, Plaintiff has offered little more than names and titles of individuals which is insufficient for the Court to make such a determination. Putting aside the fact that some of these employees apparently violated policies other than the CPS Volunteer Policy, Plaintiff does not present evidence about their respective supervisors, work history,

---

[8] Plaintiff mentions Currin (who was the PSMA wrestling coach at some point), Bernthal (who was the baseball and basketball coach at some point), and Waller (who was a teacher at PSMA in 2007 or 2008 but still teaches in the CPS system) in his response brief. (Pl.'s Resp. at 489, Dkt. 65). None of them are mentioned in Plaintiff's statement of additional material facts, though. (Dkt. 70).

[9] The Court notes that the sections of Plaintiff's response identifying individuals who were allegedly similarly situated to Plaintiff lack any citation to legal authority whatsoever to support Plaintiff's arguments. (Pl.'s Resp. at 486-491, Dkt. 65).

performance reviews, or instances of past discipline, if any. *See id.* at 369 (plaintiff failed to identify similarly situated employees when he failed to submit work history or performance reviews, among other things).

At most, Plaintiff suggests that Wipachit and Mares, who were found along with Plaintiff to have violated the Volunteer Policy, should count. But again, even if they were not his supervisors and thus not likely comparable employees, absent additional facts about their backgrounds and circumstances, the Court cannot assess if they are similarly situated to Plaintiff. Because Plaintiff failed to identify a single similarly situated employee treated more favorably, his prima facie case fails under *McDonnell Douglas*.

### III. *Ortiz* Test

Plaintiff's claims fare no better when analyzed under *Ortiz*, which instructs that "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766. In other words:

> Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

*Id.* at 765. The standard under *Ortiz* "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . *caused* the discharge or other adverse action." *Id.* (emphasis added). The Seventh Circuit has identified "ambiguous or suggestive comments or conduct," "better treatment of people similarly situated but for the protected characteristic," and "dishonest employer justifications for disparate treatment" as "three broad types of circumstantial evidence that will support an inference of intentional discrimination." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). The Court draws all reasonable inferences in Plaintiff's

15

favor on summary judgment as it must, but nevertheless concludes the evidence "as a whole" in this record does not show that Plaintiff was terminated because of race.

Plaintiff has no direct evidence of discrimination here. Therefore, he must rely on the "broad" categories of circumstantial evidence identified by *Joll*, none of which support his claim of race discrimination. First, the record lacks any hint of "ambiguous or suggestive" comments which would support a finding of discriminatory animus. In fact, Plaintiff admits that he cannot attribute any race-related statements or comments to Wipachit or Mares, and that no race-related comments or statements were made about or to him. Second, as discussed *supra*, Plaintiff has not pointed to a similarly situated comparator. Finally, Plaintiff has not raised a triable issue of fact as to Defendant's motive in terminating him for violating the Volunteer Policy. Indeed, Plaintiff relies solely upon his own speculation that Defendant was dishonest in its reasoning, which is far from sufficient to stave off summary judgment. *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment."). *See also Dale v. Chi. Trib. Co.*, 797 F.2d 458, 465 (7th Cir. 1986) (affirming summary judgment and holding that "[plaintiff] must do more than challenge the judgment of his superiors through his own self-interested assertions.").

At the end of the day, Defendant offered a legitimate nondiscriminatory reason for terminating Plaintiff—his violation of the Volunteer Policy—and this record is devoid of any evidence to suggest that Defendant's actions were racially motivated. Plaintiff clearly feels that the investigation and resulting termination were unfair, as he was not informed of the charges against him, potential key witnesses (such as the PSMA athletic director and assistant coach Smothers) were not interviewed, Gooden was asked only a few quick questions, and Plaintiff was not told that he could call or subpoena witnesses to testify at the investigatory conference on his

behalf. But this Court is not tasked with determining whether Defendant's actions were fair or right, but rather whether they were motivated by illegal discriminatory animus. After all, "[t]his Court does not sit as a super-personnel department that reexamines an entity's business decisions." *Dale v. Chi. Trib. Co.*, 797 F.2d 464 (7th Cir. 1986). The record does not reflect that Plaintiff's race played any role in Defendant's decisionmaking. Whether analyzed under *McDonnell Douglas* or *Ortiz*, that means Plaintiff cannot establish pretext. Accordingly, summary judgment in favor of Defendant is appropriate.

## **CONCLUSION**

For all the foregoing reasons, Defendant's motion for summary judgment is granted.

**DATED**: April 11, 2025    **ENTERED**:

*LaShonda A. Hunt*
LASHONDA A. HUNT
United States District Judge